FREDERICK S. PHILLIPS, D.C. Bar 433729
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7166
Washington, D.C. 20044
(202) 305-0439
Frederick.phillips@usdoj.gov
Attorney for Plaintiff United States

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>)<br>DYNO NOBEL, INC., )<br>)<br>Defendant. )<br>)<br>_____ ) | Civil No. |

**COMPLAINT**

The United States of America ("United States"), by the authority of the Attorney General

of the United States, on behalf of the United States Environmental Protection Agency ("EPA"),

alleges as follows:

**NATURE OF ACTION**

1.      This is a civil action for injunctive relief and civil penalties brought against Dyno

Nobel, Inc. ("Dyno Nobel" or "Defendant") for violations of Section 103 of the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9603;

Sections 304 and 313 of the Emergency Planning and Community Right-to-Know Act

1

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

("EPCRA"), 42 U.S.C. §§ 11004 and 11023; Section 112(r)(7) of the Clean Air Act ("CAA"), 42 U.S.C. § 7412(r)(7); and the respective implementing regulations.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355; CERCLA Section 109(c)(1), 42 U.S.C. § 9609(c)(1); EPCRA Sections 325(b)(3) and (c)(4), 42 U.S.C. §§ 11045(b)(3) and (c)(4); and CAA Section 113(b), 42 U.S.C. § 7413(b). The Court has personal jurisdiction over the parties.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395; CERCLA Section 109(c)(1), 42 U.S.C. § 9609(c)(1); EPCRA Sections 325(b)(3) and (c)(4), 42 U.S.C. §§ 11045(b)(3) and (c)(4); and CAA Section 113(b), 42 U.S.C. § 7413(b), because the events giving rise to this action arose at a facility Defendant owns and operates within this judicial district.

4.      Authority to bring this civil action is vested in the Attorney General of the United States, pursuant to 28 U.S.C. §§ 516 and 519; CERCLA Section 109(c), 42 U.S.C. § 9609(c); EPCRA Sections 325(b)(3) and (c)(1), 42 U.S.C. §§ 11045(b)(3) and (c)(1); and CAA Sections 113(b) and 305, 42 U.S.C. §§ 7413(b) and 7605.

## NOTICE TO STATE

5.      Notice of the commencement of this action has been provided to the State of Oregon pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

## PARTIES

6.      Plaintiff is the United States of America, acting at the request of the EPA, an agency of the United States.

7.      Defendant is a Delaware corporation that at all times relevant to this Complaint owned and operated a manufacturing facility near St. Helens, Oregon that makes anhydrous

2

ammonia and related chemical products used for fertilizer, refrigerant, and other agricultural and industrial applications ("St. Helens Facility" or "Facility").

8.      Defendant is a "person" under CERCLA Section 101(21), 42 U.S.C. § 9601(21), and 40 C.F.R. § 302.3; EPCRA Section 329(7), 42 U.S.C. § 11049(7), and 40 C.F.R.§ 355.61; and CAA Section 302(e), 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY FRAMEWORK

### CERCLA EMERGENCY RELEASE NOTIFICATION REQUIREMENTS

9.      CERCLA Section 103(a), 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6 require that, with certain exceptions not relevant here, any person in charge of an onshore facility shall, as soon as that person has knowledge of any release of a hazardous substance from such facility in quantities equal to or greater than the reportable quantity under CERCLA Section 102, 42 U.S.C. § 9602, and 40 C.F.R. § 302.4, immediately notify the National Response Center ("NRC") of such release.

10.      Pursuant to CERCLA Sections 102 and 103, 42 U.S.C. §§ 9602 and 9603, EPA promulgated regulations referred to here as the "CERCLA Emergency Release Notification Rules," published at 40 C.F.R. Part 302. The CERCLA Emergency Release Notification Rules designate hazardous substances, identify reportable quantities for these substances, and set forth notification requirements for these substances.

11.      Subject to certain exclusions not relevant here, CERCLA Section 101(22), 42 U.S.C. § 9601(22), and 40 C.F.R. 302.3 define "release" as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment. "Environment" includes the ambient air within or under the jurisdiction of the United States. CERCLA Section 101(18), 42 U.S.C. § 9601(18), and 40 C.F.R. § 302.3.

3

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

12.     40 C.F.R. § 302.3 defines "reportable quantity" as that quantity the release of which requires notification pursuant to 40 C.F.R. Part 302.

13.     The notification requirements under CERCLA Section 103 are triggered by a release of a reportable quantity of a hazardous substance within any 24-hour period. 40 C.F.R. § 302.6(a).

14.     The CERCLA Emergency Release Notification Rules provide a reduced reporting option for facilities with releases of hazardous substances that are "continuous" and "stable in quantity and rate." Under 40 C.F.R. § 302.8(a), no notification is required for any release of a hazardous substance that is, pursuant to the definitions provided in 40 C.F.R. § 302.8(b), continuous and stable in quantity and rate (referred to here as "continuous releases") provided the facility provides the notifications required by 40 C.F.R. § 302.8(c). This reporting option is referred to here as "continuous release reporting."

15.     For purposes of continuous release reporting under 40 C.F.R § 302.8:

    a.  a "continuous" release is a release that occurs without interruption or abatement or that is routine, anticipated, or intermittent and incidental to normal operations or treatment processes;

    b.  the "normal range" of a release is all releases (in pounds or kilograms) of a hazardous substance reported or occurring over any 24-hour period under normal operating conditions during the preceding year. Only releases that are continuous may be included in the normal range;

    c.  a "routine" release is a release that occurs during normal operating procedures or processes;

4

    d.  a release that is "stable in quantity and rate" is a release that is predictable and regular in amount and rate of emission; and

    e.  a "statistically significant increase" ("SSI") in a release is an increase in the quantity of the hazardous substance released above the upper bound of the reported normal range of the release.

16.    The notifications required for continuous release reporting under 40 C.F.R. § 302.8(c) include, among other things, notification at such times as an increase in the quantity of the hazardous substance being released during any 24-hour period represents a statistically significant increase as defined in 40 C.F.R. § 302.8(b). This notification must be made to the NRC as soon as a person in charge of the facility has knowledge of the increase and the release must be identified as a statistically significant increase in a continuous release. 40 C.F.R. § 302.8(h); see also 40 C.F.R. § 302.8(g).

17.    A determination of whether a release is a statistically significant increase under 40 C.F.R. § 302.8 is made based on calculations or estimation procedures that identify releases that exceed the upper bound of the normal range. 40 C.F.R. § 302.8(h). The upper bound of the normal range is also referred to as the "SSI trigger."

18.    Each hazardous substance release reported under the continuous release reporting option in 40 C.F.R. § 302.8 must be evaluated annually to determine if changes have occurred in the information submitted in the initial written notification, the follow-up notification, and/or in a previous change notification. 40 C.F.R. § 302.8(i).

19.    The reduced reporting requirements of the continuous release reporting option provided under 40 C.F.R. § 302.8 apply only so long as the person in charge complies fully with all requirements of 40 C.F.R. § 302.8(c). Failure to comply with the requirements of 40 C.F.R.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

§ 302.8 with respect to any release from the facility subjects the person in charge to all reporting

requirements of 40 C.F.R. § 302.6 for each such release, to the penalties under 40 C.F.R.

§ 302.7, and to any other applicable penalties provided for by law. 40 C.F.R. § 302.8(m).

20.     Anhydrous ammonia (under the category "ammonia") is a hazardous substance

listed in 40 C.F.R. § 302.4, with a reportable quantity of 100 pounds.

21.     Pursuant to CERCLA Section 109(c), 42 U.S.C. § 9609(c), the United States may

bring a civil action seeking civil penalties for violations of CERCLA Section 103(a), 42 U.S.C.

§ 9603(a).

<u>EPCRA EMERGENCY RELEASE NOTIFICATION REQUIREMENTS</u>

22.     Pursuant to EPCRA Section 304, 42 U.S.C. § 11004, EPA promulgated

regulations referred to here as the "EPCRA Emergency Release Notification Rules," published at

40 C.F.R. Part 355. The EPCRA Emergency Release Notification Rules establish requirements

for a facility to provide information necessary for developing state and local chemical emergency

response plans and requirements for emergency notification of chemical releases.

23.     Under EPCRA Section 304(a), 42 U.S.C. § 11004(a), and 40 C.F.R. §§ 355.30

and 355.40(a),  if a release of an extremely hazardous substance occurs from a facility at which a

hazardous chemical is produced, used, or stored, and such release requires notification under

CERCLA Section 103(a), 42 U.S.C. § 9603(a), the owner or operator of the facility shall

immediately provide notice of such release to the community emergency coordinator for the

Local Emergency Planning Committee ("LEPC") of any area likely to be affected by the release

and to the State Emergency Response Commission ("SERC") of any state likely to be affected

by the release, as provided in EPCRA Section 304(b), 42 U.S.C. § 11004(b), and

40 C.F.R. Part 355.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

24.     EPCRA Section 304(c), 42 U.S.C. 11004(c), and 40 C.F.R. §§ 355.30 and 355.40(a), require the owner or operator of a subject facility, as soon as practicable after a reportable release occurs, to provide the affected LEPC(s) and SERC(s) a written follow-up emergency notice (or notices as information becomes available) setting forth and updating the information required under Section 304(b), 42 U.S.C. 11004(b), and 40 C.F.R. § 355.40(b).

25.     EPCRA Section 329(2), 42 U.S.C. § 11049(2), and 40 C.F.R. § 355.61 define "environment" as including water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

26.     EPCRA Section 329(8), 42 U.S.C. § 11049(8), and 40 C.F.R. § 355.61 define "release" as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic chemical.

27.     "Reportable quantity" is defined under 40 C.F.R. § 355.61 as, for any CERCLA hazardous substance, the quantity established in Table 302.4 of 40 C.F.R. § 302.4, for such substance; for any extremely hazardous substance, the quantity established in Appendices A and B of 40 C.F.R. Part 355 for such substance; or if no other quantity is established, a weight of one pound.

28.     The emergency notification requirements under EPCRA Section 304 are triggered by a release of a reportable quantity of an extremely hazardous substance within any 24-hour period. 40 C.F.R. § 355.33.

U.S. v. Dyno Nobel, Inc. -- COMPLAINT

29.     EPCRA Section 302(b)(2), 42 U.S.C. 11004(b)(2), and 40 C.F.R. § 355.40(a) specify the information that must be included in the immediate notification required by EPCRA Section 302(a), 42 U.S.C. 11004(a), and 40 C.F.R. §§ 355.30 and 355.40(a).

30.     As under the CERCLA Emergency Release Notification Rules, the EPCRA Emergency Release Notification Rules provide a reduced reporting option for facilities with releases of extremely hazardous substances that are "continuous" and "stable in quantity and rate." Under 40 C.F.R. § 355.32, an owner or operator that qualifies for reduced reporting under 40 C.F.R. 302.8 is not required to provide the notifications required under 40 C.F.R. § 355.40, provided the owner or operator makes all of the notifications to affected LEPCs and SERCs required by 40 C.F.R. § 302.8.

31.     Anhydrous ammonia (under the category "ammonia") is an extremely hazardous substance listed in 40 C.F.R. Part 355, Appendices A and B, with a reportable quantity of 100 pounds.

32.     Under EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), the United States is authorized to bring a civil action seeking civil penalties for violations of EPCRA Section 304, 42 U.S.C. § 11004.

<u>EPCRA TOXIC RELEASE INVENTORY REPORTING REQUIREMENTS</u>

33.     EPCRA Section 313(a), 42 U.S.C. § 11023(a), and 40 C.F.R. §§ 372.22 and 372.30, require the owner or operator of a facility covered by Section 313 to submit annually, no later than July 1 of each year, a Toxic Chemical Release Inventory Reporting Form, EPA Form 9350-1 ("Form R"), to EPA and to the state in which the facility is located, for each toxic chemical referenced in Section 313(c) of EPCRA and listed in 40 C.F.R. § 372.65 that was manufactured, imported, processed, or otherwise used at the facility during the preceding

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

calendar year in quantities exceeding the established toxic chemical threshold specified in

EPCRA Section 313(f), 42 U.S.C. § 11023(f), and 40 C.F.R. §§ 372.25, 372.27, and 372.28.

34.     Pursuant to EPCRA Sections 313 and 328, 42 U.S.C. §§ 11023 and 11048, EPA

promulgated regulations referred to here as the "TRI Reporting Requirements," published at

40 C.F.R. Part 372. The TRI Reporting Requirements set forth the definitions and requirements

for submission of information relating to the release of toxic chemicals under EPCRA Section

313 so as to inform the public and communities surrounding subject facilities about releases of

toxic chemicals.

35.     Under EPCRA Section 329, 42 U.S.C. § 11049, and 40 C.F.R. § 372.3, the "toxic

chemicals" that are subject to the reporting requirements under EPCRA Section 313 and

40 C.F.R. § 372.30 are listed at 40 C.F.R. § 372.65.

36.     Ammonia (CAS Number 7664-41-7, in the form of anhydrous ammonia) is a

toxic chemical listed at 40 C.F.R. § 372.65, with a threshold quantity for reporting of 25,000

pounds manufactured or processed for the year, as set forth at 40 C.F.R. § 372.25.

37.     Under 40 C.F.R. § 372.22, a facility that has 10 or more full-time employees, that

is in specified industrial classifications, and manufactured (including imported), processed or

otherwise used a toxic chemical in excess of an applicable reporting threshold in a calendar year

is a covered facility for that calendar year and must report under 40 C.F.R. § 372.30 by filing a

Form R.

38.     The information required to be reported on a Form R for any toxic chemical is set

forth in 40 C.F.R. § 372.85. Among other things, a Form R must include:

   a.  the following certification by a "senior management official" as defined in

        40 C.F.R. § 372.3: "I hereby certify, to the best of my knowledge and

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

belief," that the Form R is "based on reasonable estimates using data available to the preparer of the report." 40 C.F.R. § 372.85(b)(2); and

b.  information on releases of stack or point source air emissions of the toxic chemical to the environment during the previous calendar year. 40 C.F.R. § 372.85(b)(14)(i)(B).

39.  The owner or operator may use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved using data available to the preparer of the report, but is not required to monitor or measure the quantities, concentration, or frequency of any toxic chemical released into the environment beyond that monitoring and measurement required under other provisions of law or regulation. 42 U.S.C. § 11023(g)(2).

40.  Under EPCRA Section 325(c), 42 U.S.C. § 11045(c), the United States is authorized to bring a civil action seeking penalties for violations of EPCRA Section 313, 42 U.S.C. § 11023.

## CLEAN AIR ACT RISK MANAGEMENT PROGRAM REQUIREMENTS

41.  Section 112(r) of the CAA, 42 U.S.C. § 7412(r), authorizes EPA to promulgate regulations and programs in order to prevent and minimize the consequences of accidental releases of certain regulated substances. In particular, CAA Section 112(r)(3), 42 U.S.C. § 7412(r)(3), mandates that EPA promulgate a list of substances that are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment if accidentally released. CAA Section 112(r)(5), 42 U.S.C. § 7412(r)(5), requires that EPA establish, for each listed substance, the threshold quantity over which an accidental release is known to cause or may reasonably be anticipated to cause death, injury, or serious

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

adverse effects to human health. Finally, CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), requires EPA to promulgate requirements for the prevention, detection, and correction of accidental releases of regulated substances.

42.     The regulations promulgated pursuant to CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), are found at 40 C.F.R. Part 68, the Risk Management Program regulations ("Part 68"). All references in the Complaint to Part 68 are to Part 68 as in effect on May 15, 2015.

43.     CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. Part 68, require the owner or operator of a stationary source at which a regulated substance is present in more than a threshold quantity to develop and implement a risk management plan ("RMP") and program to detect and prevent or minimize accidental releases of such substances from the stationary source and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

44.     CAA Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A), and 40 C.F.R. § 68.3 define "accidental release" as an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

45.     40 C.F.R. § 68.3 defines "process" as "any activity involving a regulated substance, including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities. For purposes of this definition, any group of vessels that are interconnected, or separate vessels that are located such that a regulated substance could be involved in a potential release, shall be considered a single process."

46.     Under 40 C.F.R. §§ 68.10(a) and 68.150(b), after June 21, 1999, the requirements of 40 C.F.R. Part 68, including the requirement to submit an RMP, apply to any process that uses, stores, manufactures, or handles more than the threshold quantity of a regulated substance,

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

no later three years after the substance is first listed under Part 68 or the date on which the process first exceeds the threshold quantity for such regulated substance, whichever is later.

47.     Each process in which a regulated substance is present in more than a threshold quantity (referred to here as a "covered process") is subject to one of three risk management programs. Program 1 is the least comprehensive, and Program 3 is the most comprehensive. Pursuant to 40 C.F.R. § 68.10(b), a covered process is subject to Program 1 if, among other things, the distance to a toxic or flammable endpoint for a worst-case release assessment is less than the distance to any public receptor. Under 40 C.F.R. § 68.10(d), a covered process is subject to Program 3 if the process does not meet the eligibility requirements for Program 1 and is either in a specified North American Industry Classification System ("NAICS") or is subject to the United States Occupational Safety code or subject to the Occupational Safety and Health Administration ("OSHA") process safety management ("PSM") standard at 29 C.F.R. § 1910.119. Under 40 C.F.R. § 68.10(c), a covered process that meets neither Program 1 nor Program 3 eligibility requirements is subject to Program 2.

48.     Anhydrous ammonia is a regulated substance under CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. Part 68, with a threshold quantity of 10,000 pounds.

49.     Under 40 C.F.R. §§ 68.12(a) and (d) and 68.150, the owner or operator of a stationary source subject to 40 C.F.R. Part 68 must submit to EPA a single RMP that includes the information required by 40 C.F.R. §§ 68.155 through 68.185 for all covered processes.

50.     40 C.F.R. § 68.12(a) and (d) require that, in addition to submitting a single RMP, the owner or operator of a stationary source with a Program 3 covered process (a "subject stationary source") shall, among other things, develop and implement a management system as provided in 40 C.F.R. § 68.15; conduct a hazard assessment as provided in 40 C.F.R. §§ 68.20

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

through 68.42; implement the accident prevention requirements of 40 C.F.R. §§ 68.65 through 68.87; develop and implement an emergency response program as provided in 40 C.F.R. §§ 68.90 through 68.95; and submit as part of the RMP the data on prevention program elements for Program 3 processes as provided in 40 C.F.R. § 68.175.

51.     Under CAA Section 113(b), 42 U.S.C. § 7413(b), the United States is authorized to bring a civil action seeking appropriate injunctive relief and civil penalties for violations of the Clean Air Act and the regulations promulgated thereunder.

### **GENERAL ALLEGATIONS**

#### The Defendant and the Dyno Nobel Facility

52.     Defendant has at all relevant times been the "owner or operator" (as those terms are defined in CERCLA Section 101(20), 42 U.S.C. § 9601(20), CAA Section 112(a)(9), 42 U.S.C. 7412(a)(9), and EPCRA Sections 304 and 313, 42 U.S.C. §§ 11004 and 11023) of the Dyno Nobel Facility located at 63149 Columbia River Highway in St. Helens, Oregon.

53.     Defendant manufactures anhydrous ammonia, ammonium hydroxide solutions (aqua ammonia), urea solutions, urea prill, ultra-low biuret urea pellets, ammonium nitrate solutions, urea ammonium nitrate solutions, and carbon dioxide using feedstocks of natural gas, ambient air, and purified water. The products made and stored at the Dyno Nobel Facility are sold for use in agricultural and industrial products, including fertilizer and ammonia-based refrigerants.

54.     During all times relevant to this Complaint, the Dyno Nobel Facility operated under NAICS Code 325311, nitrogenous fertilizer manufacturing.

55.     During all times relevant to this Complaint, Defendant employed 10 or more "full-time employees," as defined in 40 C.F.R. § 372.3, at the Dyno Nobel Facility.

13

56.     During all times relevant to this Complaint, the Dyno Nobel Facility manufactured more than 25,000 pounds of ammonia per year.

57.     The Dyno Nobel Facility has a peak ammonia production capacity of approximately 306 tons per day and, at any one time, stores between approximately one and 2.5 million gallons of anhydrous ammonia and 10,000 to 50,000 gallons of ammonium nitrate on site at the Facility.

58.     The Dyno Nobel Facility is located in Columbia County in Oregon, less than one-half mile from the Columbia River, which marks the Oregon/Washington boundary. The Facility is located approximately two miles north of Columbia City, Oregon (population approximately 2,000), three miles south of Deer Island, Oregon (population approximately 200), and four miles northwest of St. Helens, Oregon (population approximately 13,500). Woodland, Washington (population approximately 6,000) is located directly across the Columbia River, approximately four miles west and is in both Clark and Cowlitz Counties.

59.     The Dyno Nobel Facility contains process equipment that uses, stores, manufactures, or handles anhydrous ammonia and from which an accidental release, as defined in CAA Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A), and 40 C.F.R. § 68.3, of anhydrous ammonia may occur.

60.     The Dyno Nobel Facility is therefore a "stationary source" as defined in CAA Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3.

61.     The Dyno Nobel Facility is also a "facility" as defined in CERCLA Section 101(9), 42 U.S.C. § 9601(9), and 40 C.F.R. § 302.3 and in EPCRA Section 329(4), 42 U.S.C. § 11049(4), and 40 C.F.R. §§ 355.61 and 372.3. It is also an "on-shore facility" as defined in CERCLA Section 101(18), 42 U.S.C. § 9601(18), and 40 C.F.R. § 302.3.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

62.     At the Dyno Nobel Facility, natural gas, steam, and air are combined in catalytic

reactors (vessels) in what is referred to as the "gas preparation area" to produce nitrogen,

hydrogen, and carbon dioxide. The nitrogen produced is then reacted with hydrogen over a

catalyst at high temperature to produce anhydrous ammonia in the Ammonia Plant. The

anhydrous ammonia from the Ammonia Plant is then converted to aqua ammonia or further

reacted with carbon dioxide and air to produce urea in the Urea Plant, which is then either further

reacted with air over a catalyst to produce nitric acid in the Nitric Acid Plant, or further reacted

with nitric acid to produce ammonium nitrate in the Ammonium Nitrate Plant. Beginning with

the gas preparation area, the vessels and piping in these plants and processes are interconnected

and at all relevant times contained more than 10,000 pounds of anhydrous ammonia. The vessels

and piping, and their associated valves and safety relief valves, are thus collectively a "process"

under 40 C.F.R. § 68.3 ("Dyno Nobel Covered Process"), subject to the requirements of

40 C.F.R. Part 68.

63.     The Dyno Nobel Covered Process is a "Program 3" covered process because the

process is subject to the OSHA Process Safety Management requirements in 29 C.F.R.

§ 1910.119 and does not meet all of the Program 1 eligibility requirements in 40 C.F.R.

§ 68.10(b).

64.     Dyno Nobel has filed, and periodically updated, RMPs for the Dyno Nobel

Covered Process since June 1, 1999, and as recently as July 11, 2016, when Defendant reported

having 2.20 million pounds of anhydrous ammonia and 212,895 pounds of aqueous ammonia in

the Dyno Nobel Covered Process.

<u>EPCRA/CERCLA and TRI Reports</u>

65.     From 2002 to the present, the Dyno Nobel Facility has operated under Continuous

Release Reports filed with EPA Region 10 under 40 C.F.R. §§ 302.8 and 355.32. The

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

Continuous Release Reports established sources of ammonia at the Dyno Nobel Facility that were claimed to be "continuous" and "stable in quantity and rate," as those terms are defined in 40 C.F.R. § 302.8. These Continuous Release Reports stated that the upper bound of the normal range of aggregate continuous ammonia emissions from the Dyno Nobel Facility was between 1,330 and 2,574 pounds per day (lbs/day), which is identified as the SSI trigger on the reports. One of the emission sources identified as contributing to the continuous aggregate emissions is the "Urea Surge Tank Vent" (also referred to as the "Vent Scrubber C-654"), which Defendant identified as having continuous emissions of ammonia of 29 to 30 pounds per day.

66.     Defendant has filed Form R reports under EPA's Toxic Release Inventory reporting program under EPCRA Section 313, 42 U.S.C. § 11023, since at least July 2010. For reporting years 2012 through 2016, Defendant reported continuous aggregate ammonia emissions from all stacks or point sources at the Dyno Nobel Facility of between 590,847 and 660,000 lbs/year.

<u>2010 Ammonia Releases</u>

67.     On August 30, 2010, at approximately 1:00 p.m., following an emergency shutdown of the Dyno Nobel Facility the day before, a valve was opened between Ammonia Storage Tank V-651 and an atmospheric vent located on the top of the Prill Tower to reduce pressure during the planned startup of the Dyno Nobel Facility. Operational difficulties delayed the startup of the Dyno Nobel Facility until the morning of August 31, 2010.

68.     Following startup of the Dyno Nobel Facility on August 31, 2010 at approximately 6:00 a.m., until the valve between Ammonia Storage Tank V-651 and the Prill tower was closed on September 5, 2010, at 4:35 p.m., a total of approximately 24.5 tons of ammonia was "released" into the "environment" from the "Facility," as those terms are defined

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

in CERCLA Section 101(22), 42 U.S.C. § 9601(22), and 40 C.F.R. 302.3, and EPCRA Section 329(8), 42 U.S.C. § 11049(8), and 40 C.F.R. § 355.61. The releases occurred at a rate of approximately 6.3 pounds per minute (or 4.5 tons per day) and are collectively referred to here as the "Aug/Sept 2010 Ammonia Releases."

69.     On September 3, 2010, at 9:00 a.m., while the Aug/Sept 2010 Ammonia Releases were continuing, a citizen in Columbia City, Oregon reported an ammonia odor and called Columbia River Fire and Rescue.

70.     Dyno Nobel reported the Aug/Sept 2010 Ammonia Releases between 4:42 and 4:57 p.m. on September 5, 2010, to the NRC, Oregon and Washington SERCs, and Columbia County, Cowlitz County, and Clark County LEPCs.

2015 Ammonia Releases

71.     Beginning the morning of July 30, 2015 and continuing through August 1, 2015, Defendant attempted multiple startups of the Urea Plant at the Dyno Nobel Facility. During this time, a total of approximately 6.6 tons of ammonia in excess of amounts emitted under normal operations was "released" into the "environment" from Vent Scrubber C-654 at the "Facility," as those terms are defined in CERCLA Section 101(22), 42 U.S.C. § 9601(22), and 40 C.F.R. 302.3, and EPCRA Section 329(8), 42 U.S.C. § 11049(8), and 40 C.F.R. § 355.61. The following amounts of ammonia in excess of amounts emitted under normal operations were released from Vent Scrubber C-654: 1.1 tons on July 30, 2015; 3.3 tons on July 31, 2015; and 2.2 tons on August 1, 2015. These releases are collectively referred to here as the "July/Aug 2015 Ammonia Releases."

17

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

72.     During the July/Aug 2015 Ammonia Releases, multiple citizens of Columbia City, Oregon called government officials to report foul odors and temporary eye irritation and breathing problems.

73.     Defendant reported the July/Aug 2015 Ammonia Releases between 10:48 and 10:59 a.m. on August 7, 2015, to the NRC, Oregon and Washington SERCs, and Columbia County, Cowlitz County, and Clark County LEPCs.

74.     On September 16, 2015, Defendant submitted to EPA Region 10 a spreadsheet showing the basis for Defendant's estimate that an additional 6.6 tons of ammonia was emitted from the Dyno Nobel Facility from July 30 through August 1, 2015. The spreadsheet shows "average" emissions of ammonia from Vent Scrubber C-654 under "normal" conditions as 133 lbs/hour. The engineer employed by Defendant who prepared the spreadsheet based the estimates on the Facility's standard operating procedures, plant operating data, the timeline of the internal investigation of the July/Aug 2015 releases, 2009 stack test data of Vent Scrubber C-654, and an engineering study of Vent Scrubber C-654.

75.     Plaintiff and Defendant entered into a Tolling Agreement dated May 18, 2015, as most recently amended on May 21, 2019, which tolls from May 15, 2015 through June 14, 2019 any applicable statute of limitations for civil claims brought by Plaintiff against Defendant for violations of CERCLA Section 103, 42 U.S.C. § 9603; EPCRA Section 304, 42 U.S.C. § 11004; and CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), at the Dyno Nobel Facility.

## FIRST CLAIM FOR RELIEF

### (*Failure to Report the 2010 Ammonia Releases to the NRC*)

76.     The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

77. On each day from August 30 through September 5, 2010 during the Aug/Sept 2010 Ammonia Releases, approximately four tons of ammonia was released from an atmospheric vent located on the top of the Prill Tower at the Dyno Nobel Facility, far in excess of the reportable quantity for ammonia of 100 lbs/day.

78. The Aug/Sept 2010 Ammonia Releases were not covered by Defendant's Continuous Release Reports.

79. A "person in charge" of the Dyno Nobel Facility, within the meaning of CERCLA Section 103, 42 U.S.C. § 9603, and 40 C.F.R. § 302.6, had actual or constructive knowledge of the Aug/Sept 2010 Ammonia Releases at or around the time the releases began.

80. Defendant did not immediately notify the NRC of the Aug/Sept 2010 Ammonia Releases.

81. Defendant's failure to immediately notify the NRC of the ammonia releases on each day during the Aug/Sept 2010 Ammonia Releases violates CERCLA Section 103(a), 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6.

82. Pursuant to CERCLA Section 109(c), 42 U.S.C. § 9609(c), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CERCLA Section 103(a), 42 U.S.C. § 9603(a) and 40 C.F.R. § 302.6. The applicable maximum civil penalty per day for each violation is $37,500 and, in the case of a second or subsequent violation, $107,500.

## SECOND CLAIM FOR RELIEF

(*Failure to Report the 2010 Ammonia Releases to affected LEPCs and SERCs* )

83. The United States realleges paragraphs 1 through 75 and 77 through 79 above as if fully set forth herein.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

84.     Columbia County in Oregon and Clark and Cowlitz Counties in Washington were each affected by the Aug/Sept 2010 Ammonia Releases.

85.     The State of Oregon and the State of Washington were each affected by the Aug/Sept 2010 Ammonia Releases.

86.     Defendant failed to immediately notify the affected LEPCs or SERCs of the Aug/Sept 2010 Ammonia Releases.

87.     Defendant's failure to immediately notify each of the affected LEPCs and SERCs of the Aug/Sept 2010 Ammonia Releases violates Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2).

88.     Pursuant to EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2). The applicable maximum civil penalty per day for each violation is $37,500 and, in the case of a second or subsequent violation, $107,500.

## THIRD CLAIM FOR RELIEF

### (*Failure to Report the 2015 Ammonia Releases to the NRC*)

89.     The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

90.     On each day from July 30 through August 1, 2015 during the July/Aug 2015 Ammonia Releases, more than one ton of ammonia was released from Vent Scrubber C-654 at the Dyno Nobel Facility into the atmosphere, far in excess of the reportable quantity of ammonia of 100 lbs/day.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

91.     The July/Aug 2015 Ammonia Releases were not covered by Defendant's Continuous Release Reports.

92.     A "person in charge" of the Dyno Nobel Facility, within the meaning of CERCLA Section 103, 42 U.S.C. § 9603, and 40 C.F.R. § 302.6, had actual or constructive knowledge of the July/Aug 2015 Ammonia Releases at or around the time the releases began.

93.     Defendant did not immediately notify the NRC of the July/Aug 2015 Ammonia Releases.

94.     Defendant's failure to immediately notify the NRC of the July/Aug 2015 Ammonia Releases violates CERCLA Section 103(a), 42 U.S.C. § 9603(a) and 40 C.F.R. § 302.6.

95.     Pursuant to CERCLA Section 109(c), 42 U.S.C. § 9609(c), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CERCLA Section 103(a), 42 U.S.C. § 9603(a) and 40 C.F.R. § 302.6. The applicable maximum civil penalty per day for each violation is $37,500 and, in the case of a second or subsequent violation, $117,500.

## FOURTH CLAIM FOR RELIEF

(*Failure to Report the 2015 Ammonia Releases to affected LEPCs and SERCs* )

96.     The United States realleges paragraphs 1 through 75 and 90 through 92 above as if fully set forth herein.

97.     Columbia County in Oregon and Clark and Cowlitz Counties in Washington were each affected by the July/Aug 2015 Ammonia Releases.

98.     The State of Oregon and the State of Washington were each affected by the July/Aug 2015 Ammonia Releases.

21

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

99.     Defendant failed to immediately notify the affected LEPCs or SERCs of the July/Aug 2015 Ammonia Releases.

100.    Defendant's failure to immediately notify the affected LEPCs and SERCs of the July/Aug 2015 Ammonia Releases violates Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), 40 C.F.R. § 355.42(a)(2).

101.    Pursuant to EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2). The applicable maximum civil penalty per day for each violation is $37,500 and, in the case of a second or subsequent violation, $117,500.

## FIFTH CLAIM FOR RELIEF

### (*Failure to Report Continuous Releases of Ammonia to EPA and the NRC*)

102.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

103.    On one or more days from May 15, 2010 through the present, a person in charge of the Dyno Nobel Facility had actual or constructive knowledge that aggregate continuous emissions of ammonia from the release points identified in Defendant's Continuous Release Report in effect at that time ("the applicable Continuous Release Report") exceeded the SSI trigger for the Dyno Nobel Facility, and were therefore not covered by the applicable Continuous Release Report.

104.    On one or more days from May 15, 2010 through the present, Defendant failed to immediately notify the NRC of continuous releases of ammonia that exceeded the SSI trigger in

U.S. v. Dyno Nobel, Inc. -- COMPLAINT

the applicable Continuous Release Report, as required by CERCLA Section 103(a), 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6.

105.    On one or more days from May 15, 2010 through the present, Defendant failed to notify EPA Region 10 and the NRC of a statistically significant increase in ammonia emissions on each day that continuous releases of ammonia from the point sources identified in the applicable Continuous Release Report were exceeding the upper bound of the normal range previously reported by Defendant, as required by 40 C.F.R. § 302.8(g)(2) and (h).

106.    Defendant's failure to notify EPA Region 10 and the NRC that continuous releases of ammonia exceeded the SSI trigger in the applicable Continuous Release Report violates CERCLA Section 103(a), 42 U.S.C. § 9603(a), and 40 C.F.R. §§ 302.6, 302.8(g)(2), and 302.8(h).

107.    Pursuant to CERCLA Section 109(c), 42 U.S.C. § 9609(c), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CERCLA Section 103(a), 42 U.S.C. § 9603(a), and 40 C.F.R. §§ 302.6 and 302.8. The applicable maximum civil penalty per day for each violation occurring after January 12, 2009, and on or before November 2, 2015 is $37,500 and, for violations occurring after November 2, 2015, is $57,317.  In the case of violations subsequent to the initial violations, the applicable maximum penalty is $107,500 per day for each violation after January 12, 2009 and before December 6, 2013; $117,500 per day for each violation occurring after December 6, 2013 and on or before November 2, 2015; and $171,592 per day for each violation after November 2, 2015.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

## SIXTH CLAIM FOR RELIEF

(*Failure to Report to Continuous Releases of Ammonia to affected LEPCs and SERCs*)

108.    The United States realleges paragraphs 1 through 75 and 103 through 105 above as if fully set forth herein.

109.    Columbia County in Oregon and Clark and Cowlitz Counties in Washington were each affected by daily continuous releases of ammonia that occurred from the Dyno Nobel Facility from May 15, 2010 to the present.

110.    The State of Oregon and the State of Washington were each affected by daily continuous releases of ammonia that occurred from the Dyno Nobel Facility from May 15, 2010 to the present.

111.    Defendant failed to immediately notify the affected LEPCs and SERCs of continuous releases of ammonia that exceeded the SSI trigger in the applicable Continuous Release Report, as required by Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2).

112.    Defendant's failure to immediately notify the affected LEPCs and SERCs that continuous releases of ammonia exceeded the SSI trigger in the applicable Continuous Release Report violates Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2).

113.    Defendant also failed to provide the affected LEPCs or SERCs with a written follow-up emergency notice (or notices as information became available) setting forth and updating the information required to be reported under Section 304(b), 42 U.S.C. 11004(b), and 40 C.F.R. § 355.40(b), as soon as practicable after the releases discussed in paragraph 103 occurred.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

114.    Defendant's failure to provide the written follow-up reports to the affected LEPCs and SERCs for ammonia releases that exceeded the applicable SSI trigger violates EPCRA Section 304(c), 42 U.S.C. 11004(c), and 40 C.F.R. §§ 355.30 and 355.40(a).

115.    Pursuant to EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.42(a)(2). The applicable maximum civil penalty per day for each violation occurring after January 12, 2009, and on or before November 2, 2015 is $37,500 and, for violations occurring after November 2, 2015, is $57,317. In the case of violations subsequent to the initial violations, the applicable maximum penalty is $107,500 per day for each violation after January 12, 2009 and before December 6, 2013; $117,500 per day for each violation occurring after December 6, 2013 and on or before November 2, 2015; and $171,952 per day for each violation after November 2, 2015.

## SEVENTH CLAIM FOR RELIEF

*(Failure to Accurately Report Ammonia Releases in its Annual Form R Report)*

116.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

117.    Pursuant to EPCRA Section 313, 42 U.S.C. § 11023, Defendant is required annually to submit a toxic chemical release form (Form R). For reporting years 2013 through 2017, Defendant has reported on its Form Rs submitted to EPA and the State of Oregon annual stack or point source air emissions of ammonia from the Dyno Nobel Facility of between 590,847 and 663,095 pounds.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

118.    Annual point source emissions from Vent Scrubber C-654 alone are substantially greater than the total stack or point source emissions reported on Dyno Nobel Facility's Form R reports.

119.    Defendant's failure to accurately report its total stack or point source air emissions of ammonia on its Form R submissions to EPA and the State of Oregon for calendar years 2013 through 2017 violates EPCRA Section 313, 42 U.S.C. § 11023, and 40 C.F.R. § 372.85(b).

120.    Pursuant to EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of EPCRA Section 313, 42 U.S.C. § 11023, and 40 C.F.R. § 372.85(b). The applicable maximum civil penalty per day for each violation occurring after January 12, 2009, and on or before November 2, 2015 is $37,500 and, for violations occurring after November 2, 2015, is $57,317.  In the case of violations subsequent to the initial violations, the applicable maximum penalty is $107,500 per day for each violation after January 12, 2009 and before December 6, 2013; $117,500 per day for each violation occurring after December 6, 2013 and on or before November 2, 2015; and $171,952 per day for each violation after November 2, 2015.

## EIGHTH CLAIM FOR RELIEF

*(Failure to Compile All Required Safety Information)*

121.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

122.    Under 40 C.F.R. § 68.65, the owner or operator of a subject stationary source is required to compile specified written process safety information before conducting any process hazard analysis required by 40 C.F.R. Part 68. The purpose of this requirement is to enable the

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

owner or operator and the employees involved in operating the process to identify and understand the hazards posed by those processes involving regulated substances.

123.    Defendant first completed a process hazard analysis for the Dyno Nobel Covered Process on or about September 18, 1996, and most recently completed a process hazard analysis for such process on or about February 26, 2016.

124.    Defendant failed to timely compile required process safety information for the Fairchild Model TA6000-41 pressure transducer and its associated gasket that failed on approximately September 14, 2012, resulting in a 7,814-pound ammonia release. Specifically, Defendant failed to timely compile the electrical classification and design codes and standards employed for this equipment, as required by 40 C.F.R. § 68.65(d)(1)(iii) and (vi).

125.    Defendant failed to timely compile required process safety information for certain pressure relief valves installed on various vessels in the gas preparation area, namely, information pertaining to the relief system design and design basis, as required by 40 C.F.R. § 68.65(d)(1)(iv).

126.    Defendant failed to have process safety information on the safe upper and lower limits, and the anticipated consequences of deviation from those limits, for the Vent Scrubber C-654, as required by 40 C.F.R. § 68.65(c)(1). This failure contributed to an emission rate that overwhelmed the Vent Scrubber, resulting in the July/Aug 2015 Ammonia Releases.

127.    Each of the foregoing failures to compile process safety information violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.65.

128.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty not to exceed $37,500 per day for each violation occurring

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

## NINTH CLAIM FOR RELIEF

*(Failure to Develop and Implement Written Operating Procedures)*

129.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

130.    Under 40 C.F.R. § 68.69, the owner or operator of a subject stationary source is required to develop and implement written operating procedures that provide clear instructions for safely conducting activities involved with each covered process consistent with the process safety information. The required operating procedures must address steps for the operating phases identified in 40 C.F.R. § 68.69(a), operating limits, safety and health considerations, and safety systems.

131.    The operating phases required to be addressed in the written operating procedures specifically include "startup following a turnaround or after an emergency shutdown." 40 C.F.R. § 68.69(a)(1)(vii).

132.    Defendant failed to have written operating procedures meeting the requirements of 40 C.F.R. § 68.69(a) that addressed startup after an emergency shutdown for the Urea Plant, which is part of the Dyno Nobel Covered Process.

133.    This failure contributed to the Aug/Sept 2010 Ammonia Releases of 24.5 tons and the July/Aug 2015 Ammonia Releases of 3.6 tons.

134.    The written operating procedures also are required to address safety systems and their functions. 40 C.F.R. § 68.69(a)(1)(vii).

28

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

135.    Defendant's operating procedures failed to address the following safety systems: explosion doors on crank cases and fire monitors, as required by 40 C.F.R. § 68.69(a)(4).

136.    Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.69.

137.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

### TENTH CLAIM FOR RELIEF

*(Failure to Comply with Mechanical Integrity Requirements)*

138.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

139.    The mechanical integrity requirements of 40 C.F.R. § 68.73 apply to the following process equipment in a covered process: pressure vessels and storage tanks; piping systems (including piping components such as valves); relief and vent systems and devices; emergency shut down systems; controls (including monitoring devices and sensors, alarms, and interlocks); and pumps. 40 C.F.R. § 68.73(a).

140.    As the owner or operator of a subject stationary source, Defendant is required to establish and implement written procedures to maintain the ongoing integrity of the process equipment specified in 40 C.F.R. § 68.73(a). 40 C.F.R. § 68.73(b).

141.    Defendant failed to establish and implement written procedures to maintain the ongoing integrity of the following process equipment in the Dyno Nobel Covered Process:

       a.    ammonia feed pumps;

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

b.   rotating equipment (pumps);

c.   Hypercirc Compressor K-602 (a pump); and

d.   acoustic monitors (controls).

142.    Defendant failed to implement its written procedures for maintaining the ongoing integrity of its pressure relief devices, as evidenced by Defendant's failure to externally inspect each pressure relief device every year and remove and test such devices at specified intervals, consistent with Defendant's written inspection and testing procedures for pressure relief devices.

143.    Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.73(b).

144.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

## ELEVENTH CLAIM FOR RELIEF

*(Failure to Inspect and Test for Mechanical Integrity)*

145.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

146.    As the owner or operator of a subject stationary source, Defendant is required to perform inspections and tests of the process equipment specified in 40 C.F.R. § 68.73(a) that follow recognized and generally accepted good engineering practices and are conducted at a frequency consistent with applicable manufacturer's recommendations and good engineering practices, and more frequently if determined to be necessary by prior operating experience. 40 C.F.R. § 68.73(d)(1)-(d)(3).

30

147.     Defendant also is required to document each inspection and test that has been conducted on the specified process equipment, recording certain specified information. 40 C.F.R. 68.73(d)(4).

148.     Defendant failed to perform the required inspections and tests on the following process equipment, including properly documenting the required inspections and testing:

        a.   various pump components, including the South Ammonia Feed Pump P-651, the failure of which caused an ammonia release on March 31, 2011;

        b.   high pressure regulator PVC-6025 (a control), the failure of which caused an ammonia release on August 7, 2012;

        c.   alarms on the acoustic monitors (controls); and

        d.   relief devices and other process equipment and piping systems.

149.     Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.73(d).

150.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

## TWELFTH CLAIM FOR RELIEF

### *(Failure of Quality Assurance in Maintenance Materials)*

151.     The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

152.     The owner or operator of a subject stationary source is required to ensure that maintenance materials, spare parts, and equipment are suitable for the process application for which they will be used. 40 C.F.R. § 68.73(f)(3).

153.     Defendant failed to assure that maintenance materials, spare parts and equipment were suitable for the process application for which they would be used, as evidenced by the following:

     a.  Defendant had no written quality assurance program for maintenance materials and spare parts;

     b.  piping used for a reformer did not meet specifications for the process for which it was used;

     c.  the Fairchild Model TA6000-41 pressure transducer (a control) was not suitable for the outdoor installation in which used; and

     d.  improper materials were used in Ammonia Feed Pump P-651, which resulted in a March 31, 2011 ammonia release of between 100 and 200 pounds.

154.     Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.73(f)(3).

155.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

## THIRTEENTH CLAIM FOR RELIEF

*(Failure to Promptly Correct Compliance Audit Findings)*

156.    The United States realleges paragraphs 1 through 75 above as if fully set forth herein.

157.    The owner or operator of a subject stationary source is required to certify that it has evaluated compliance with the Program 3 Prevention Program requirements of 40 C.F.R. Part 68, Subpart D, at least every three years to verify that the procedures and practices developed under Subpart D are adequate and are being followed. 40 C.F.R. § 68.79(a). This is referred to as a "compliance audit."

158.    The owner or operator is required to promptly determine and document an appropriate response to each of the findings of the compliance audit, and to document that the deficiencies have been corrected.

159.    Defendant's June 19, 2013 Compliance Audit Findings states that "there are six outstanding action items from the last [2010] compliance audit and five that had not been completely addressed."

160.    Defendant failed to promptly determine and document an appropriate response to each of the following findings in its May 31, 2010 Compliance Audit Report, as evidenced by findings in Defendant's June 19, 2013 Compliance Audit Report:

> a.   lack of separate procedures for startup following an emergency shutdown;
>
> b.   failure to review all safe work practices on a routine basis and make updates as necessary;
>
> c.   failure to timely provide lock out, tag out training to employees or document that such training had been provided;

33

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

d.   failure to finalize written training procedures and document that

employees had been consulted regarding the frequency of refresher

training;

e.   failure to timely provide refresher training for employees that issue hot-

work permits or document that such training had been provided; and

f.   failure to have written maintenance procedures for primary and secondary

reformers.

161.     Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.79(d).

162.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19,

Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C.

§ 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring

on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring

after that date.

## FOURTEENTH CLAIM FOR RELIEF

*(Failure to Review Incident Investigation Reports with Affected Personnel)*

163.     The United States realleges paragraphs 1 through 75 above as if fully set forth

herein.

164.     An owner or operator of a subject stationary source is required to investigate and

prepare a report of each incident which resulted in or reasonably could have resulted in a

catastrophic release of regulated substances. 40 C.F.R. § 68.81(a) and (d).

165.     Such reports must be reviewed with all affected personnel whose job tasks are

relevant to the incident findings, including contract employees where applicable. 40 C.F.R.

§ 68.81(f).

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**

166.     Defendant had incidents which resulted in or reasonably could have resulted in a catastrophic release of regulated substances, and prepared reports of the investigations of such incidents.

167.     Defendant did not consistently review all such incident investigation reports with all affected personnel whose job tasks are relevant to the incident findings.

168.     Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.81(f).

169.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for each violation of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and 40 C.F.R. § 68.65 not to exceed $37,500 per day for each violation occurring on or before November 2, 2015, and not to exceed $99,681 per day for each violation occurring after that date.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States respectfully requests that this Court grant the following relief:

1.     Enter judgment finding Defendant is liable for the foregoing violations;

2.     Assess civil penalties against Defendant in amounts not to exceed those provided pursuant to CERCLA Section 109(c)(1), 42 U.S.C. § 9609(c)(1); EPCRA Sections 325(b)(3) and (c)(1), 42 U.S.C. §§ 11045(b)(3) and (c)(1); and CAA Section 113(b), 42 U.S.C. § 7413(b).

3.     Order Defendant to take appropriate steps as may be necessary to remedy violations;

U.S. v. Dyno Nobel, Inc. -- COMPLAINT

4.    Award the United States its costs in this action; and

5.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section


Dated:  June 24, 2019                         /s/ Frederick S. Phillips
                                              FREDERICK S. PHILLIPS, D.C. Bar 433729
                                              Senior Attorney
                                              Environmental Enforcement Section
                                              Environment & Natural Resources Division
                                              U.S. Department of Justice
                                              P.O. Box 7611
                                              Washington, D.C. 20044
                                              (202) 305-0439
                                              Frederick.phillips@usdoj.gov




                                              BILLY J. WILLIAMS
                                              United States Attorney
                                              District of Oregon




Dated:  June 24, 2019                         /s/ Alexis Lien
                                              ALEXIS LIEN
                                              Assistant United States Attorney
                                              District of Oregon
                                              1000 SW Third Ave Suite 600
                                              Portland, Oregon 97204
                                              (503) 727-1098

**U.S. v. Dyno Nobel, Inc. -- COMPLAINT**